**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

YEFERSON DORANTE HENRIQUEZ,

Petitioner,

-v- 9:26-CV-1709 (AJB)

DAVID VENTURELLA *et al.*,

Respondents.

**Hon. Anthony Brindisi, U.S. District Judge:**

**DECISION and ORDER**

## I. INTRODUCTION

On September 10, 2026, shortly after being detained by immigration authorities, petitioner filed a verified emergency petition with this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2241, seeking immediate release (the "petition"). Dkt. No. 1. The petition names the following respondents: Acting Director of U.S. Immigration and Customs Enforcement ("ICE") David Venturella; Acting Field Office Director of the ICE Buffalo Field Office Philip Rhoney; Acting U.S. Attorney General Todd Blanche, and Secretary of the Department of Homeland Security ("DHS") Markwayne Mullin (collectively "respondents"). *Id.*

The petition has been fully briefed. Dkt. Nos. 5, 6. For the reasons set forth below, the Court grants the petition.

## II. BACKGROUND

On July 31, 2023, petitioner Yeferson Dorante Henriquez ("petitioner"), a Venezuelan national, presented himself at a United States port of entry seeking admission. Dkt. No. 1 ¶ 7; *see*

*also* Dkt. No. 5-1 ("Form I-213"); Dkt. No. 5-2 ("NTA"). DHS released petitioner into the United States on humanitarian parole pursuant to 8 U.S.C. § 1182(d)(5)(A). *See* Form I-213; Dkt. No. 5-3 ("Form I-94"). Petitioner was granted Temporary Protected Status ("TPS") beginning in March 2024. Dkt. No. 5 at 1 n.2; *see also* Dkt. No. 5-4; Dkt. No. 6 at 1. Petitioner's parole status—separate from his TPS status— had an expiration date of July 29, 2024. *See id.* He timely applied for asylum and withholding of removal on July 8, 2024. Dkt. No. 1 ¶ 7. Thereafter, his TPS authorization expired on April 2, 2025, and DHS terminated the applicable Venezuela TPS designation. *See* Dkt. No. 5 at 1 n.2 (citing 90 Fed. Reg. 9,040 (Feb. 5, 2025); 90 Fed. Reg. 43,225 (Sept. 8, 2025)); *see also* Dkt. No. 6 at 1. His asylum claim remained pending.

On September 10, 2026, petitioner was detained during a traffic stop in Troy, New York and taken into ICE custody. Dkt. No. 1 ¶ 6. According to the petition, petitioner was arrested without a warrant and without an individualized determination by an immigration judge or any other authority that he posed a danger or flight risk. *Id.* ¶¶ 6, 31, 46, 51. Respondents represent that petitioner fled when the officers activated their emergency lights. Dkt. No. 5 at 2. At the time of his detention, petitioner was living in Watervliet, New York with his wife and child. Dkt. No. 1 ¶ 8.

Upon his arrest, petitioner was charged with, among other things, having entered the United States without admission or inspection in violation of 8 U.S.C. § 1182(a)(6)(A)(i). Dkt. No. 1 ¶ 2. Respondents have treated petitioner as subject to mandatory detention under 8 U.S.C. § 1225(b)(2), under which he is not eligible for release on bond. *Id.* ¶¶ 11, 32. Petitioner contends that his detention instead falls under 8 U.S.C. § 1226(a), which provides for discretionary detention and permits a noncitizen to seek release on bond. *Id.* ¶¶ 37–39.

Petitioner seeks immediate and unconditional release from custody and an order preventing his transfer outside the Northern and Western Districts of New York. Dkt No. 1 ¶ 5; *see also* Dkt. No. 4. In the alternative, petitioner seeks an individualized bond hearing at which the government would bear the burden of establishing that his continued detention is warranted. Dkt. No. 1 ¶ 33.

## III. DISCUSSION

### A. Statutory Authority for Petitioner's Detention

Petitioner asserts that his detention is governed by 8 U.S.C. § 1226(a), rather than 8 U.S.C. § 1225(b)'s mandatory detention provision, and that his continued detention without a bond hearing violates § 1226(a) and the Due Process Clause. Dkt. No. 1 ¶¶ 37–39, 41–42.

Section 1226(a) states, in relevant part, that "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). Under Section 1226(a), detention is discretionary and "the Attorney General . . . may release the alien on bond . . . or conditional parole." *Id.* § 1226(a)(2)(A)–(B).

Conversely, Section 1225(b)(2) provides for mandatory detention during standard removal proceedings. Under § 1225(b)(2), a noncitizen who is determined by an immigration officer to be "not clearly and beyond a doubt" entitled to be admitted "shall be detained" for a standard removal proceeding. § 1225(b)(2)(A). A noncitizen detained under § 1225(b)(1) or § 1225(b)(2) may not be released and is not entitled to a bond hearing. *See, e.g.*, *Lopez Benitez v. Francis*, 795 F. Supp. 3d 475, 484 (S.D.N.Y. 2025) (citing *Jennings v. Rodriguez*, 583 U.S. 281, 297 (2018) ("[N]either § 1225(b)(1) nor § 1225(b)(2) says anything whatsoever about bond hearings.")).

As an initial matter, respondents acknowledge that the Second Circuit's recent decision in *Barbosa da Cunha v. Freden*, 175 F.4th 61 (2d Cir. 2026), "appears to foreclose" DHS's position

that petitioner's detention is properly governed by § 1225. Dkt. No. 5 at 3. In *Barbosa da Cunha*, the Second Circuit held that § 1225(b)(2)(A) did not govern the detention of a noncitizen who was present in the interior of the United States and was not apprehended while entering the country or shortly thereafter. 175 F.4th at 72–78. Rather, the panel concluded that such a noncitizen's detention was governed by § 1226(a). *Id.*

Although petitioner was initially encountered at a port of entry and thereafter released on parole under § 1182(d)(5)(A), that distinction does not alter the analysis. As the Second Circuit explained in *Barbosa da Cunha*, § 1226(a) applies to noncitizens who are already present in the United States while removal proceedings remain pending, and "once an alien enters the country, the legal circumstance changes, whether their presence here is lawful, unlawful, temporary, or permanent." 175 F.4th at 86 (quoting *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)) (cleaned up).

Recent decisions in this District have applied *Barbosa da Cunha* to conclude that § 1226(a) applies in materially similar circumstances. *See, e.g.*, *Ampuero v. Venturella*, 2026 WL 1983211, at *2–5 (N.D.N.Y. July 8, 2026); *Torrez Arce v. Blanche*, 2026 WL 1430509, at *2–4 (N.D.N.Y. May 21, 2026); *Vergel Gonzalez v. Rhoney*, 2026 WL 2327690, at *7–9 (N.D.N.Y. Aug. 12, 2026).

Those courts have concluded that a noncitizen who was encountered at the border, subsequently paroled into the United States, and later re-arrested in the interior after living in this country for an extended period is no longer "seeking admission" for purposes of § 1225(b)(2)(A). Instead, § 1226(a) governs their detention and release. *See Torrez Arce*, 2026 WL 1430509, at *2; *see also Aldaz v. ICE Field Off. Dir.*, 2026 WL 936167, at *3 (N.D.N.Y. Apr. 7, 2026) (noting that "Section 1225(b)(2)(A) authorizes the Government to detain certain aliens seeking admission into the country, while Section 1226(a) authorizes the Government to detain certain aliens already in

the country pending the outcome of removal proceedings.") (internal quotation marks and citations omitted).

The same reasoning applies here. Petitioner presented himself at a port of entry on July 31, 2023, was paroled into the United States under § 1182(d)(5)(A), and remained at liberty in the United States until ICE re-arrested him more than three years later on September 10, 2026. Dkt. No. 6 at 1–2. Petitioner's September 2026 arrest was not a continuation of his initial border encounter, but rather "an independent decision to detain [him] after the expiration of his parole." *Ampuero*, 2026 WL 1983211, at *3 (quoting *Ivonin v. Rhoney*, 2026 WL 199283, *4 (W.D.N.Y. Jan. 26, 2026)). Indeed, respondents recognize that courts in this District have consistently reached that conclusion on similar sets of facts. Dkt. No. 5 at 3. Accordingly, because petitioner had been living in the United States for more than three years at the time of his September 2026 arrest, his present detention is governed by § 1226(a), not § 1225(b).

In an effort to avoid this obvious conclusion, respondents emphasize that petitioner's prior release was pursuant to DHS's parole authority under § 1182(d)(5)(A), rather than a custody determination under § 1226(a), and that ICE treated his September 10, 2026 detention as a return to custody following the expiration of parole. Dkt. No. 5 at 2. In addition, respondents argue that ICE considered petitioner's loss of TPS status in its allegedly "individualized assessment" of petitioner's re-detention. *Id.*

But these arguments do not alter the statutory source of petitioner's current detention. *See Torrez Arce*, 2026 WL 1430509, at *1-4 ("The Court therefore concludes that [p]etitioner, who was paroled into the United States approximately two years before his arrest, was not seeking admission when he was arrested, and § 1225(b)(2)(A) therefore does not apply"). Nor does the expiration or termination of petitioner's TPS justify a different result. *See Hernández Lazo v.*

*Noem*, 818 F. Supp.3d 328, 344 (E.D.N.Y. 2026) ("Courts have concluded that the termination of TPS does not render a noncitizen a person seeking admission to the United States such that they are subject to mandatory detention under § 1225(b)(2)."); *Francois v. Noem*, 2026 WL 27565, at *3 (E.D. Pa. Jan. 5, 2026) (slip opinion) ("The fact [petitioner] had TPS which then expired also does not impact his petition. Courts in this district and around the country have found a petitioner's TPS status does not materially impact their right to habeas relief under similar circumstances.") (collecting cases). Thus, whatever significance petitioner's prior parole and/or TPS status may have for the process constitutionally required before re-detention, it does not place his present detention within § 1225(b). Section 1226(a) governs.

**B. Due Process**

Petitioner argues that his detention violates his rights under the Fifth Amendment. "[T]he Due Process Clause covers noncitizens, whether their presence here is lawful, unlawful, temporary, or permanent." *Velasco Lopez v. Decker*, 978 F.3d 842, 850 (2d Cir. 2020). The Second Circuit has applied the balancing test set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976) to determine the adequacy of the process afforded to a noncitizen detained under § 1226(a). *Id.* In *Mathews*, the Supreme Court identified three factors that bear on the constitutional need for additional procedural protections: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335.

All three *Mathews* factors cut in petitioner's favor. First, petitioner's liberty interest is substantial. "Freedom from imprisonment—from government custody, detention, or other forms

of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690. "And [p]etitioner's liberty interest is even more heightened because the deprivation of his liberty does not stem from any criminal adjudication." *Nany v. Blanche*, 2026 WL 1842635, at *4 (W.D.N.Y. June 26, 2026).

Second, the procedures employed created a substantial risk of erroneous deprivation. Petitioner was released on parole in July 2023 and remained at liberty for more than three years before ICE re-detained him. Dkt. No. 5 at 1–2. Nothing in the record indicates that, before ICE undertook to re-detain him, petitioner had been determined to pose a danger to the community or a risk of flight. Indeed, "[t]he purpose of requiring an exercise of discretion [under § 1226(a)] prior to the decision to detain a noncitizen who is not subject to mandatory detention is to prevent an erroneous deprivation of liberty." *Lopez Benitez*, 795 F. Supp. 3d at 495.

Respondents have failed to identify any material change in circumstances that might alter this analysis. "Section 1226(a)'s implementing regulations require an individualized determination as to whether the detention of a noncitizen is appropriate after considering whether the noncitizen (1) is a 'danger to property or persons' and (2) is 'likely to appear for any future proceeding.'" *Parra v. Ball*, 2026 WL 1960934, *4 (N.D.N.Y. June 30, 2026) (quoting *Hyppolite v. Noem*, 808 F. Supp. 3d 474, 491 (E.D.N.Y. 2025)) (cleaned up). Respondents "have not demonstrated, or even suggested, that any individualized determination was made as to whether Petitioner posed any risk of flight or danger before he was detained." *Id.*

Respondents argue that ICE treated petitioner's September 10 arrest as a return to custody following the expiration of parole, yet still "conducted an individualized assessment before deciding to re-detain [p]etitioner." *Id.* (citing Dkt. No. 5-5). To that end, respondents contend, "ERO officers, after consulting ICE's Office of the Principal Legal Advisor . . . conducted an

individualized assessment when deciding to re-detain the [p]etitioner following his prior parole termination and loss of TPS . . . [t]he I-213 reflects that officers considered specific, case-particular factors, including discrepancies in the [p]etitioner's reported address change and a change in his TPS status." Dkt. No. 5 at 2.

But neither consideration demonstrates that ICE undertook an individualized determination that petitioner had become a danger or a flight risk. Petitioner's TPS authorization had already expired in April 2025, and the subsequent termination of Venezuela's TPS designation was a nationwide change rather than an individualized development bearing on petitioner's dangerousness or likelihood of appearing for future proceedings. *See* Dkt. No. 5 at 1 n.2; Dkt. No. 6 at 3. Nor do respondents explain how the asserted discrepancy concerning petitioner's address reflected a material change in his risk of flight or danger to the community. At best, then, the I-213 shows that ICE considered facts that might be specific or particular to petitioner, but respondents have not connected those facts to the considerations that properly govern detention under § 1226(a).

Respondents also point to petitioner's conduct during the September 10 enforcement operation, including his alleged flight from officers. Dkt. No. 5 at 2. That conduct, however, occurred only *after* ICE officers had already undertaken a targeted operation to apprehend petitioner. *Id.* This conduct therefore could not have informed the antecedent decision to re-detain him. *See* Dkt. No. 6 at 2 n.1. Accordingly, respondents have not shown that, before petitioner was returned to custody, ICE made an individualized determination based on materially changed circumstances that he posed a danger to the community or a risk of flight. The Court therefore finds a high risk of erroneous deprivation of petitioner's liberty.

Third, although the Government has a substantial interest in enforcing immigration law and ensuring appearance at removal proceedings, *Zadvydas*, 533 U.S. at 690, "the Government has

not articulated an interest in the prolonged detention of noncitizens who are neither dangerous nor a risk of flight." *Velasco Lopez*, 978 F.3d at 854. Here, the Government's interest in detaining petitioner is slim. Petitioner had been living at liberty in the United States for over three years before his re-detention and has a still-pending asylum application. *See* Dkt. No. 6 at 1. Respondents, as explained above, have pointed to no evidence that petitioner poses a danger to the community or a risk of flight. Under these circumstances, the Government's interest in petitioner's continued detention carries relatively little weight.

Balancing the *Mathews* factors, the Court concludes that petitioner was entitled to an individualized determination before being returned to immigration custody. Respondents' failure to provide such process violated petitioner's Fifth Amendment right to due process.

### C. Appropriate Remedy

"Habeas is at its core a remedy for unlawful executive detention" and "[t]he typical remedy for such detention is, of course, release." *Munaf v. Geren*, 553 U.S. 674, 693 (2008) (citations omitted). Respondents ask the Court to order a "prompt, individualized bond hearing before an Immigration Judge, not immediate release." Dkt. No. 5 at 3.

After considering the relevant facts and the governing law, and after reviewing the outcomes of other judicial opinions resolving similar matters in this District, the Court concludes that the appropriate remedy is petitioner's immediate release. *See Parra v. Favro*, 2026 WL 1030870, at *7 (N.D.N.Y. Apr. 16, 2026) (collecting cases).

## IV. CONCLUSION

Therefore, it is

ORDERED that

1. The Petition for a writ of habeas corpus (Dkt. No. 1) is **GRANTED**;

2. Respondents shall immediately release petitioner from custody;

3. Respondents shall certify compliance with this Order by filing a status report by 5:00 p.m. on October 16, 2026;

4. Petitioner shall not be re-detained without adequate notice and without an opportunity to be heard at a hearing where respondents will have the burden of showing that his detention is authorized under 8 U.S.C. § 1226(a) and the burden to demonstrate by clear and convincing evidence that petitioner is either a danger to the community or a flight risk; and

5. Pending the issuance of any final removal order against petitioner, respondents are also enjoined from denying him bond in any subsequent proceeding on the basis that he must be detained pursuant to 8 U.S.C. § 1225(b), absent a change in relevant circumstances.

The Clerk of the Court is directed to terminate the pending motions.

**IT IS SO ORDERED.**

Dated: October 9, 2026
Utica, New York.

Anthony J. Brindisi
U.S. District Judge